UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA HATCHETT,

    Plaintiff,

v.                                                                                    Case No. 04-72230

HEALTH CARE AND RETIREMENT                          HONORABLE AVERN COHN
CORPORATION OF AMERICA, an Ohio
corporation d/b/a HEARTLAND HEALTH
CARE CENTER – DEARBORN HEIGHTS
and also d/b/a HCR MANOR CARE,

    Defendant.

_____/

**<u>MEMORANDUM AND ORDER</u>**
**<u>GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**I. Introduction**

    This is an employment discrimination case under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2 <u>et seq</u>.; and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2101 <u>et seq</u>. Plaintiff Brenda Hatchett (Hatchett) is suing Defendant Health Care and Retirement Corp. of America, d/b/a Heartland Health Care Center–Dearborn Heights and HCR Manor Care (Heartland), for (1) race discrimination based on disparate pay under Title VII and ELCRA and (2) retaliation under Title VII and ELCRA.

    Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the motion is GRANTED and this case is DISMISSED.

## II. Background

### A. Factual Background[1]

Heartland is a skilled nursing facility located in Dearborn Heights, Michigan. Hatchett, a registered nurse and an African-American female, applied for employment at Heartland on May 23, 2003. She applied for the position of RN supervisor and listed on her employment application that her salary expectation was negotiable. Myrtle Powell (Powell), Heartland's human resources manager and also an African-American female, interviewed Hatchett in the latter part of May 2003. Hatchett was offered the position of midnight nurse manager at Heartland. Hatchett began her employment at Heartland on June 9, 2003 as midnight nurse manager. Her base salary at that time was $27.25 per hour; she also was paid an additional $2.00 per hour shift differential, bringing her total hourly pay rate to $29.25.

In early September 2003, Heartland hired Toni Morse (Morse), a Caucasian female, as the day shift unit manager in Heartland's short-term rehabilitation unit. Morse's resume reflected that she had management experience at a skilled nursing facility prior to her employment at Heartland. Morse was hired at a base salary of $29.50 per hour.

Also in early September 2003, Leorea Heard (Heard), an African-American female, began working at Heartland as the day shift unit manager in the long-term care unit. Heard did not have management experience at a skilled nursing facility prior to her

---

[1] The factual background is taken from the parties' papers, including Heartland's statement of material facts not in dispute and Hatchett's counter-statement of material facts not in dispute.

employment with Heartland. She was hired at a base salary of $27.50 per hour.

Hatchett, Morse, and Heard all received "market raises" of 50 cents per hour in December 2003.

In January 2004, Powell inadvertently left a wage matrix listing the salaries of Heartland's employees on the copy machine by the administration office. Hatchett discovered the wage matrix and made a copy of it. Upon discovering the wage matrix, Hatchett highlighted certain names and brought it to the attention of Jeff Harper (Harper), Heartland's regional human resources manager; Kyle Fassett (Fassett), Heartland's facility administrator; and Rebecca Mazzoni (Mazzoni), Heartland's administrative director of nursing. Hatchett questioned Fassett, "Why are certain people making more than other people when they don't have the same education level?"[2]

As a result of Powell leaving the wage matrix on the copy machine and Hatchett making a copy of the document, both employees were suspended and Heartland began an investigation into the matter. On January 15, 2004, Fassett signed an employee warning notice that stated that Hatchett had violated work rules because she "failed to secure sensitive or confidential information found on copier. Copied confidential information without authorization. Mislead [sic] administrator re: dispensation of confidential information." Fassett also signed a similar employee warning notice for Powell.

Linda Neumann (Neumann), Heartland's regional director of operations, conducted an investigation into Hatchett's alleged pay disparity. At the end of her

---

[2] Morse's resume states that she has an Associate's degree in Nursing. Hatchett has a Master's degree in Nursing.

investigation, Neumann instructed Fassett to give raises to Hatchett and Heard so that they would earn the same base salary as Morse.

During all relevant times, Heartland was in a period of transition from more of a long-term care nursing facility to a short-term rehabilitation facility.  The goal of this transition was to have more nurses doing "hands-on" nursing.  This transition, known as the "$M^2$" business model, or "Medicare nursing model," resulted in the Michigan Department of Consumer and Industry Services issuing Heartland a license to increase the number of Medicare beds at Heartland from 68 to 103, an increase of more than sixty percent of resident beds available for short-term rehabilitation patients.  Diana Dixon (Dixon), Heartland's director of nursing, determined that floor nurses were lacking on the midnight shift and that the position of midnight nurse manager should be eliminated to allow for one more nurse on the floor.

On January 27, 2004, Fassett issued a letter to Hatchett indicating that the position of midnight manager was being eliminated effective March 1, 2004.  The letter stated that Hatchett was free to apply for open positions in the department.  Fassett also sent letters to Mattie Johnson and Charmelle Johnson, desk nurses, indicating that their positions were being eliminated on March 1, 2004 as well.  A subsequent letter to Hatchett on February 12, 2004 from Dixon states that Hatchett was offered the position of nurse supervisor on the midnight shift because that position was replacing the night manager position.  Dixon states in the letter that Hatchett would not accept a nurse supervisor position and that she was ineligible to transfer to a different position because

"of an active, serious disciplinary action" in her file.[3]  Dixon wrote that Hatchett's last day of employment would be February 29, 2004.

### B. Procedural Background

Noticeably absent from the parties' papers are details regarding the procedural history of this case.  It is well established that a plaintiff seeking relief under Title VII must first exhaust administrative remedies before filing suit.  See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392-98 (1982).  Hatchett attached as an exhibit to her brief in opposition of Heartland's motion a document entitled "Respondent Position Statement" that contains a notation of "EEOC #230-2004-0952," presumably a reference to an Equal Employment Opportunity Commission (EEOC) complaint.  The parties, however, do not discuss whether Hatchett filed an EEOC complaint prior to filing this lawsuit.  No indication of an EEOC right-to-sue letter appears in the record.

### III. Discussion

### A. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

[3] In addition to the warning Hatchett received after she made a copy of the wage matrix, Hatchett received disciplinary action in November and December 2003 for absenteeism/tardiness.  She also was issued a counseling statement on December 7, 2003, which stated that Hatchett was not completing her assigned tasks.

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

### B. Analysis[4]

### 1. Race Discrimination

The Court analyzes Hatchett's race discrimination claims under Title VII and ELCRA together. When analyzing race discrimination claims under ELCRA, Michigan courts look to federal precedent for guidance. Radtke v. Everett, 442 Mich. 368, 382 (1993). The same evidentiary burdens apply in ELCRA cases as in those under Title VII. Jamison v. Dow Chem. Co., 354 F. Supp. 2d 715, 733 (E.D. Mich. 2004) (citing Sumner v. Goodyear Co., 427 Mich. 505, 525 (1986)).

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that Title VII provides a cause of action for people who can establish that their employer had a discriminatory intent to pay them less based on a protected characteristic. County of Washington v. Gunther, 452 U.S. 161, 178-79 (1981). A plaintiff must establish (1) that she was a member of a protected class, (2) that she was paid less than similarly situated non-members of her protected class, and

---

[4] The Court is constrained to observe that the parties' papers were presented in a cumbersome manner. The parties also failed to follow the Court's summary judgment motion practice guidelines. The parties did not file exhibits in a separate looseleaf notebook with tabs and an index. The parties also did not file a separate appendix containing cases on which they rely. The parties each attached a copy of one case to their briefs, but neither party provided a copy in the dual-column Westlaw format as detailed in the Court's motion practice guidelines. Heartland submitted deposition transcripts in their entirety rather than only the relevant portions. Neither party highlighted relevant portions of deposition transcripts and other exhibits. For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/cohn/motion.htm.

(3) evidence of discriminatory animus. Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002). It is undisputed that Hatchett, as an African-American female, is a member of a protected class.

### a. Similarly Situated

Hatchett claims that Heartland discriminated against her because Morse, a Caucasian female day shift unit manager, received a higher wage than Hatchett. Heartland says that Hatchett was not similarly situated to Morse because of the fact that Hatchett worked the midnight shift and Morse worked the day shift. Specifically, Heartland says that day shift unit managers, like Morse, had more responsibilities than Hatchett as the midnight nurse manager because the day shift unit managers worked during a time when more patients were active and required attention. Additionally, Heartland says that, unlike Hatchett's position, the day shift unit managers had to process admissions and discharges during their shifts. Heartland says that it paid day shift unit managers more than the midnight nurse manager because of the difference in responsibilities between the two positions.

The Court of Appeals for the Sixth Circuit held in Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992) that when a plaintiff lacks direct evidence of discrimination, "the plaintiff must show that the 'comparables' are similarly-situated *in all respects*." Id. at 583 (emphasis in original). The Sixth Circuit, however, later clarified the standard articulated in Mitchell and noted that it should not be narrowly construed. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). The Ercegovich court instructed that

> [c]ourts should not assume, however, that the specific factors discussed in

> Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly situated;" rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects."

Id. (citing Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)) (emphasis in original). The court of appeals went on to explain the rationale behind the "similarly situated" standard:

> if the non-protected employee to whom the plaintiff compares himself or herself must be identically situated to the plaintiff in every single aspect of their employment, a plaintiff whose job responsibilities are unique to his or her position will *never* successfully establish a prima facie case (absent direct evidence of discrimination)."

Ercegovich, 154 F.3d at 353 (emphasis in original).

Here, it cannot be said that Hatchett and Morse are similarly situated. As the record demonstrates, particularly the deposition testimony of Powell and Fassett, and as counsel for Hatchett conceded at oral argument, a midnight nurse manager has different responsibilities than a day shift unit manager. While both Hatchett and Morse may be registered nurses and while they may have held supervisory or managerial positions at Heartland, their job responsibilities were different. Additionally, a review of the document submitted by Heartland titled "Active Employee List" shows Hatchett listed under the job title category "Nurse Supervisor, RN" along with fourteen other employees with that title, while Morse was listed under the job title "Nurse Manager" along with Heard. It is also noteworthy that Morse's resume indicates that she had extensive prior managerial experience, including such experience at a skilled nursing facility.

Hatchett's resume does not disclose past work experience at a skilled nursing facility.

### b. Discriminatory Animus

A Title VII claimant may establish discrimination by producing either direct evidence of discrimination or circumstantial evidence which would support an inference of discrimination. Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997). Hatchett here has failed to offer direct evidence of discrimination. Rather, her brief makes clear that she is attempting to establish her claim by using circumstantial evidence of discrimination.

First, Hatchett says that the discrepancy in base wages for herself, Morse, and Heard establishes an inference of discrimination. Hatchett was hired for the midnight nurse manager position at a base rate of $27.25 per hour, while Morse was hired as a day shift nurse manager at a base rate of $29.50 per hour. Heard, the other day shift nurse manager and an African-American female, was hired at a base rate of $27.50 per hour. In light of the record, however, Hatchett's argument is not persuasive. Heartland produced a report titled "active employee list" dated December 2003 that lists its employee names, their job titles, date of hire, base wage, and ethnic group. This exhibit shows that Hatchett was listed under the job title "Nurse Supervisor, RN." It lists Hatchett's hourly rate of $27.25 and ethnic group of "black." Indeed, of the fifteen other employees under the category "Nurse Supervisor, RN," only one other employee, a Caucasian, had a higher hourly rate than Hatchett, at $28.20 per hour. Of the fifteen "Nurse Supervisor, RN" employees listed on this report, six are Caucasian and nine are African-American. In fact, every Caucasian employee except one with the "Nurse Supervisor, RN" job title had a lower hourly rate than Hatchett. Additionally, Hatchett

10

was the highest-paid African-American "Nurse Supervisor, RN" listed in the report.

Second, Hatchett says that the wage matrix she discovered at Heartland had the letters "C" and "B" next to certain employee names. She says that the C's were next to Caucasian employee names and the B's were next to African-American employee names. Hatchett, however, did not produce a copy of the wage matrix she describes. She says that Heartland claims it cannot locate the wage matrix Hatchett saw with the C's and B's. The report described above that Heartland attached to its brief as an exhibit lists the ethnic group of each employee as "white" or "black," but this in and of itself does not establish an inference of discrimination. Indeed, as discussed above, a review of the other employees' hourly rates shows that Hatchett made more per hour than all but one Caucasian nurse supervisor.

Finally, Hatchett says that Fassett failed to raise her pay as Neumann instructed him to do. Hatchett says that Fassett raised her pay 75 cents, from a base rate of $27.75 per hour[5] to $28.50 per hour, when Neumann instructed Fassett to increase Hatchett's base rate to $30.00 per hour. Fassett testified that he objected to Neumann's instruction to increase the base wages of Hatchett and Heard so that they would make the same base wage as Morse. The basis for his objection, he testified, was his belief that Hatchett, Heard, and Morse had different levels of experience that justified different levels of pay. Ultimately, however, Fassett testified that he "did what [his] boss instructed [him] to do" and gave Hatchett and Heard raises. Hatchett simply has failed to demonstrate that there is a genuine issue of material fact with respect to an

---

[5] The $27.75 per hour base rate reflects Hatchett's original hourly base rate of $27.25 plus the 50-cent-per-hour "market raise" she received in December 2003.

inference of discrimination.

### 2. Retaliation

Hatchett also says that she was retaliated against for complaining about Heartland discriminating against African-American employees. She says that as a result of her complaints, she received "an unwarranted disciplinary action" and that disciplinary action precluded her from transferring to another position at Heartland.

To establish retaliation under Title VII, a plaintiff must show (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the adverse action occurred because of the protected activity. Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999). A claim of retaliation under ELCRA requires a higher standard; the plaintiff must show (1) that she opposed violations of ELCRA or participated in an activity protected by the Act and (2) her opposition or participation was a "significant factor" in the adverse employment action. Id.

Hatchett says that she engaged in protected activity when she complained to administrators at Heartland about her belief that Heartland was engaging in race discrimination. Heartland says that Harper and Fassett testified that Hatchett came to them after discovering the wage matrix and expressed concern about wage disparity based on her education level being higher than other employees. Heartland therefore argues that Hatchett cannot satisfy the first element of a prima facie case of retaliation under Title VII or ELCRA because opposing discrimination based on education is not a protected activity under either statute.

Heartland is correct that Harper and Fassett testified during their depositions that

Hatchett complained that, based on the wage matrix, she believed that she was being paid less than other employees despite her having advanced education compared with other employees. Harper, however, also testified that he believed that the character of Hatchett's complaints focused on an allegation of race discrimination. Based on this evidence, it cannot be said that Hatchett has failed to demonstrate a genuine issue of material fact with respect to the first element of a retaliation claim under Title VII or ELCRA.

Hatchett, however, cannot establish a causal connection between her complaints and an adverse employment action, nor can she establish that her complaints rose to the level of a "significant factor" in an adverse employment action. Hatchett claims that her adverse employment action was "an unwarranted disciplinary action." She does not, however, describe with specificity the disciplinary action on which she bases her retaliation claim. The record contains evidence of disciplinary action against Hatchett in November and December 2003 for absenteeism/tardiness. She also was issued a counseling statement on December 7, 2003, which stated that Hatchett was not completing her assigned tasks. With respect to her discovery and copying of the wage matrix, Heartland disciplined both Hatchett and Powell equally for that incident. Fassett signed "third/final written warning" forms for Hatchett and Powell and indicated on the forms that both of them would be subject to termination for similar future behavior. Hatchett has not provided the Court with evidence to establish a genuine issue of material fact that any of these disciplinary incidents were a result of complaints about wage disparity or race discrimination.

To the extent Hatchett claims retaliation consisted of her position being

eliminated at Heartland, the record is devoid of evidence that suggests that Heartland decided to eliminate the position of midnight nurse manager because of Hatchett's complaints. Indeed, deposition testimony in the record establishes that Heartland decided to implement the the "M$^2$" business model, or "Medicare nursing model," in October 2003. Dixon testified that, as a result of the "M$^2$" business model and the resultant increase in the number of short-term rehabilitation patients at Heartland, it was her assessment that the midnight shift needed another floor nurse to address the increased patient volumes and that eliminating the midnight nurse manager position would allow her to add another floor nurse to the midnight shift. Two other positions also were eliminated to add additional floor nurse positions. Heartland offered Hatchett the opportunity to accept the position of nurse supervisor on the midnight shift, but Hatchett declined the offer. She simply has failed to establish that there is a genuine issue of material fact with respect to all of the elements of a prima facie retaliation claim.

    SO ORDERED.


Dated: May 06, 2005                          s/Avern Cohn
                                             AVERN COHN
                                             UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 06, 2005, by electronic and/or ordinary mail.

                                                         s/Julie Owens
                                                      Case Manager
                                                      (313) 234-5160